**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| JAMES A. MEHLING, et al., | : | |
| | : | No.  99-CV-5417 (BWK) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | CLASS ACTION |
| NEW YORK LIFE INS. CO., et al., | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' MOTION AND SUPPORTING MEMORANDUM
FOR ENTRY OF ORDER AND FINAL JUDGMENT GIVING
FINAL APPROVAL TO PROPOSED CLASS ACTION SETTLEMENT**

Alan M. Sandals
Scott M. Lempert
**SANDALS & ASSOCIATES, P.C.**
One South Broad Street, Suite 1850
Philadelphia, PA  19107
(215) 825-4000

Eli Gottesdiener
**GOTTESDIENER LAW FIRM, PLLC**
498 7th Street
Brooklyn, NY  11215
(718) 788-1500

Marc I. Machiz
**COHEN, MILSTEIN, HAUSFELD
    & TOLL, PLLC**
One South Broad Street, Suite 1850
Philadelphia, PA  19107
(215) 825-4010

Barry L. Gross
**STIEF, GROSS, SAGOSKIN, GILMAN
    & CLASSETTI PC**
547 Fort Washington Avenue
P.O. Box 274
Newtown, PA  18940
(215) 968-3900

Attorneys for Plaintiffs and the Settlement Class

Dated:  December 10, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................iii

I.      BACKGROUND ..................................................................................2

     A.  Plaintiffs' Fiduciary Breach Allegations.............................................2

     B.  Discovery ...........................................................................................5

     C.  Settlement Negotiations .....................................................................7

II.     THE TERMS OF THE PROPOSED CLASS SETTLEMENT ................................8

     A.  Monetary Payment ............................................................................8

     B.  Distribution of Monetary Payment Allocated to the Pension Plans....................8

     C.  Distribution of Monetary Payment Allocated to the 401(k) Plans and to Eligible 401(k) Plan Class Members ............................................................9

     D.  Independent Advisor to the Plans .......................................................9

     E.  Release and Dismissal of Claims with Prejudice ................................10

     F.  Approval of the Settlement by Independent Fiduciaries ......................10

III.    NOTICE TO THE MEMBERS OF THE SETTLEMENT CLASS ..........................11

IV.    THE PROPOSED PLAN OF ALLOCATION TO DISTRIBUTE SETTLEMENT FUNDS TO SETTLEMENT CLASS MEMBERS WHO HAD AN ACCOUNT BALANCE IN ONE OF THE 401(k) PLANS ....................................................................................13

V.     THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE ....................14

     A.  The First *Girsh* Factor:  The Complexity, Expense, and Likely Duration of the Litigation........................................................15

     B.  The Second *Girsh* Factor: The Reaction of the Class to the Settlement.....................................................................................16

     C.  The Third *Girsh* Factor: The Stage of the Proceedings and the Amount of Discovery Completed ........................................16

**Page**

D.   The Fourth *Girsh* Factor: The Risks of Establishing Liability ...........................18

E.   The Fifth *Girsh* Factor: The Risks of Establishing Damages............................20

F.   The Sixth *Girsh* Factor: The Risks of Maintaining the Class
Action Through the Trial ...............................................................................23

G.   The Seventh *Girsh* Factor: The Ability of Defendants to
Withstand a Greater Judgment......................................................................23

H.   The Eighth *Girsh* Factor: The Range of Reasonableness of the
Settlement Fund in Light of the Best Possible Recovery and
All the Attendant Risks of Litigation............................................................24

CONCLUSION....................................................................................................................27

# TABLE OF AUTHORITIES

**Cases:**                                                                                                      **Page**

*Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993)..................................................... 17, 18

*Dupree v. Prudential Ins. Co. of Am.*,
  No. 99-8337, 2007 WL 2263892 (S.D. Fla. Aug. 10, 2007). ........................................ 18, 19, 21

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975)......................................................................... 14, 15

*Harley v. Minn. Mining and Mfg. Co.*, 284 F.3d 901 (8th Cir. 2002) ......................................... 19

*In re Cendant Corp. Litigation*, 264 F.3d 201 (3d Cir. 2001) ......................................... 15, 18, 21

*In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861 (S.D. Tex. 2004).................................... 17

*In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423 (E.D. Pa. 2001) ..................................... 14

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995)................................................................................................ passim

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)......................................... 14

*Kolar v. Rite Aid Corp.*, No. 01-1229, 2003 WL 1257272 (E.D. Pa. Mar. 11, 2003) ................. 23

*McCullough v. AEGON USA, Inc.*, No. 06-0068,
  2007 WL 3232202 (N.D. Iowa Oct. 30, 2007) ......................................................................... 20

*Mehling v. New York Life Ins. Co.*, 163 F. Supp. 2d 502 (E.D. Pa. 2001)............................... 4, 15

*Mehling v. New York Life Ins. Co.*, 413 F. Supp. 2d 476 (E.D. Pa. 2005).................................. 15

*Smith v. Dominion Bridge Corp.*, No. 96-7580,
  2007 WL 1101272 (E.D. Pa. April 11, 2007).......................................................................... 14

**Statutes and Court Rules:**

29 U.S.C. § 1106(a)(1)(A) ............................................................................................................ 26

29 U.S.C. § 1106(a)(1)(B) ............................................................................................................ 26

29 U.S.C. § 1106(a)(1)(D) ............................................................................................................ 26

Fed. R. Civ. P. 23(e) ................................................................................................................. 1, 14

Fed. R. Civ. P. 23(e)(1)(A) ........................................................................................................... 14

**Page**

**Federal Regulations:**

68 Fed. Reg. 75632-40 (Dec. 31, 2003).......................................................................... 26

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES A. MEHLING, et al., | : | |
| | : | No.  99-CV-5417 (BWK) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | CLASS ACTION |
| NEW YORK LIFE INS. CO., et al., | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' MOTION AND SUPPORTING MEMORANDUM
FOR ENTRY OF ORDER AND FINAL JUDGMENT GIVING
FINAL APPROVAL TO PROPOSED CLASS ACTION SETTLEMENT**

Plaintiffs respectfully move this Court pursuant to Federal Rule of Civil Procedure 23(e) ("Rule 23(e)"), for entry of the accompanying proposed Order and Final Judgment giving final approval to the proposed Class Action Settlement Agreement ("Settlement Agreement") which the Court preliminarily approved in its October 25, 2007 Order (the "Preliminary Order").

The Settlement Agreement resolves all claims asserted by Plaintiffs and the members of the Settlement Class against all Defendants and will result in payment of $ 14 million plus accrued interest, and minus fees and expenses as approved by the Court, to the NYL Plans.[1] 70% of these settlement funds will be allocated to the 401(k) Plans and then distributed to tens of

---

[1]     Plaintiffs bring this action on behalf of four retirement plans sponsored by Defendant New York Life Insurance Company ("NYL").  The four Plans (which are collectively referred to as the "Plans" or the "NYL Plans") are two defined benefit pension plans – The New York Life Insurance Company Pension Plan ("the Employee Pension Plan") and the NYLIC Retirement Plan ("the Agent Pension Plan") (collectively the "Pension Plans") – and two defined contribution 401(k) savings plans – The New York Life Insurance Company Employee Progress Sharing Investment Plan ("EPSI") and the New York Life Insurance Agent Progress Sharing Investment Plan ("APSI") (collectively, the "401(k) Plans").

thousands of current and former 401(k) Plan participants.  The remaining funds will be allocated to the Pension Plans, where they will not lead to an increase in benefits to Class members but nevertheless will help strengthen the funding of those plans.  The proposed Settlement also provides significant prospective relief to safeguard the interests of the Class.   Under the Settlement, the Board of Trustees of the Plans (the "Trustees") are required to retain and utilize an Independent Advisor to provide investment advice to the Trustees, and, in the case of the 401(k) Plans, to advise the Trustees regarding the selection of appropriate investment options offered to participants.

Plaintiffs and Class Counsel believe that the Settlement represents an excellent resolution of this complex ERISA class action.  It provides substantial benefits to the Class, while avoiding the considerable risks, uncertainty and delay associated with further litigation.  For this and the other reasons set forth in this memorandum, Plaintiffs and Class Counsel believe the Settlement is "fair, reasonable and adequate" and satisfies all criteria for approval under Rule 23(e). Plaintiffs and Class Counsel therefore request the Court finally approve the Settlement and enter the parties' proposed Order and Final Judgment Approving the Settlement (the "Final Order").[2]

## I.     BACKGROUND

### A.     Plaintiffs' Fiduciary Breach Allegations

This ERISA class action alleges that NYL and the Plans' Trustees (collectively referred to as "Defendants") breached their fiduciary and co-fiduciary duties under ERISA by investing or permitting the investment of billions of dollars of assets of the NYL Plans exclusively in

---

[2]     An agreed, preliminary version of the proposed Final Order is part of the Settlement Agreement (Exhibit 2), and was previously before the Court as Exhibit A to Plaintiffs' Unopposed Motion and Supporting Memorandum for Entry of Order With Respect to Certification of Modified Settlement Class and Notice and Hearing on Proposed Class Action Settlement (filed August 20, 2007).

NYL-managed ("proprietary") mutual funds ("NYL Funds" or the "Funds").[3]  The key problem with this practice, according to the Complaint,[4] is that it caused the NYL Plans to pay to the NYL Funds – and hence to their investment manager, NYL and/or its investment management affiliates – investment management fees and expenses far in excess of what the NYL Plans should have paid for even the identical services available through NYL's "separately managed account" portfolio program that was available to other institutional investors.  So too, Plaintiffs allege that Defendants knew or should have known that they were causing the NYL Plans to pay the NYL Funds fees and expenses far in excess of what the Plans would have been charged had they invested in non-NYL ("non-proprietary") institutionally-priced mutual funds, which, like separately managed account programs, must compete for the business of large institutional investors on the basis of price.

The NYL Funds, however, never had to compete for the business of the NYL Plans because, among other reasons, the Trustees, as NYL officers who had conflicting loyalties, effectively rubber-stamped the recommendations of their "Investment Advisor."  Their "Investment Adviser" was the President of the NYL Funds, whose compensation was tied to the amount of assets under the Funds' management, and who elsewhere acknowledged that the Trustees' withdrawal of the Plans' assets from the NYL Funds would be disastrous for the Funds' business, given their great dependence on the Plans for their sustainability and

---

[3]      The Funds, created in 1990, have been known by a number of different names over the years.  They were originally named the "New York Life Institutional Funds," then renamed the "MainStay Institutional Funds" in the mid-1990's, and renamed again in 2001 as the "Eclipse" Funds.  They have recently been renamed yet again, as the "MainStay Funds."

[4]      References to the "Complaint" are to the Revised Third Amended Complaint filed by Plaintiffs on February 20, 2003 (docket # 95).

profitability.  The result of these conflicts was imprudent investing and the waste of millions of dollars each year in excessive investment fees and expenses.

The Complaint also alleges that the Trustees were not alone in committing this imprudent and conflicted course of conduct.  NYL also was under a fiduciary obligation to the Plans and their participants to monitor the Trustees' performance of their fiduciary duties, *Mehling v. New York Life Ins. Co.,* 163 F. Supp. 2d 502, 510 (E.D. Pa. 2001) ("*Mehling I*"), but was itself conflicted because it stood to gain from the Trustees' unquestioning acceptance of its products and fee schedules.

As detailed in the Complaint, until this action was filed, the Trustees did nothing to remedy the situation, even when the imprudence of their use of retail-priced mutual funds with associated excessive fees and expenses was directly brought to their attention by a third-party consultant they hired to advise them on an unrelated matter.  In 1999, the Trustees retained DeMarche Associates, Inc. ("DeMarche"), to conduct an "asset allocation" study for the Plans, during the course of which DeMarche discovered that the majority of the Pension Plans' assets were invested in NYL's proprietary mutual funds.  DeMarche explicitly advised the Trustees that the Pension Plans could save over $ 7 million annually in fees simply by moving their investments from the Funds to NYL's separately managed account program, which was run by the identical portfolio managers and pursued the identical investment strategies as the Funds but at a fraction of their cost.  The Trustees did not act on DeMarche's recommendation for 18 months, and not until after the filing of this lawsuit.  Although the Trustees eventually did move the Pension Plans' assets into more suitably-priced, but still exclusively NYL-managed, investment vehicles, the Trustees continued to offer exclusively NYL Funds as investment

options to the participants of the 401(k) Plans, causing the participants to incur millions of dollars in excess fees over the ensuing years.

On the basis of these and other similar facts and allegations, the Complaint identifies the following as specific examples of Defendants' breaches of their fiduciary duties of loyalty and prudence to the Class, and resulting harm:

(1)     Investing or permitting the investment of approximately $2 billion of Pension Plan assets in the NYL Funds instead of in separately managed accounts or institutionally priced, non-proprietary mutual funds, which harmed the Pension Plans by causing them to pay millions of dollars of unnecessary fees to NYL, as the Plans' investment manager, that no prudent and disinterested fiduciary would have ever allowed the Plans to pay (Complaint at ¶¶ 89-96);

(2)     Offering or permitting the offering of unnecessarily expensive and exclusively NYL's proprietary mutual funds as investment options for the 401(k) Plans, when the 401(k) Plans, on their own or in combination with the Pension Plans, had more than enough assets to command far less expensive investment management services (*Id.* at ¶¶ 97-110); and

(3)     Using or permitting the use of NYL as the sole investment manager for the Plans, often in the face of persistently substandard returns even without regard to the NYL Funds' high fees and expenses (*Id.* at ¶¶ 30-31).

**B.      Discovery**

After the first class complaint was filed in June 2000 and briefing on the initial motion to dismiss, Plaintiffs diligently pursued discovery.  Plaintiffs propounded their First Requests for Production of Documents and First Interrogatories in January 2001.  A dispute regarding the scope of discovery arose almost immediately and lasted for over five years until the parties reached the present Settlement.[5]  Notwithstanding this dispute over the scope of discovery, Class

---

[5]      Defendants agreed to produce documents relating to the fiduciary activities of the Trustees and the actions they took with respect to management of the investments of the Plans. However, Defendants refused to produce additional documents, in the possession of NYL and its affiliates and subsidiaries, which would have demonstrated the extent to which other less expensive and more suitable investment vehicles were available to the Trustees, even from NYL

Counsel obtained and reviewed thousands of documents pertaining to the fiduciary activities of

the Trustees, including the following:

- The Plan Documents, Summary Plan Descriptions and Trust Agreements for each of the Plans;

- Agendas and Minutes of the Board of Trustee Meetings for the Plans for the entire Class Period;

- Thousands of pages of emails, correspondence and other documentation maintained by NYL and its subsidiaries and affiliates pertaining to the Plans;

- All of the prospectuses and other available public disclosure materials pertaining to the each of the NYL Funds invested in by the Plans throughout the Class Period;

- All reports on the performance of the Plans' investments prepared by NYL for the Trustees;

- Documentation pertaining to the investment advisor services provided by NYL to the Plans; and

- The Consulting Reports prepared for the Trustees by DeMarche.

Class Counsel also obtained formal and informal discovery from third parties, including

DeMarche and one of its principals, Thomas Woolwine.

After completing substantial document review, without waiting for resolution of the

dispute over the remaining documents sought by Plaintiffs, Plaintiffs took the deposition of

DeMarche and Woolwine and confirmed some of the key propositions set forth above, including

the fact that the Trustees, despite their receipt of advice from DeMarche that there were less

expensive and more suitable investment alternatives available to the Plans, delayed investing the

---

itself. Plaintiffs contended that these materials also were relevant to demonstrate the extent to which the fiduciary Defendants knew of the availability of such less expensive investments, but breached their fiduciary duties by failing to take appropriate action to prevent the Trustees from continuing to invest and maintain the assets of the Plans in the more expensive NYL Funds. Plaintiffs filed a motion to compel, which was extensively briefed (twice in fact), but the dispute remained outstanding at the time the parties agreed to settle the case.

assets of the Pension Plans in separately managed accounts, and continued to offer the NYL Funds as investment options to the 401(k) Plans.

###    C.    Settlement Negotiations

On July 13, 2005, the Court issued an Opinion and Order dismissing Plaintiffs' renewed RICO claims.  Thereafter, in late 2005, the parties began to explore a process to commence settlement discussions.  Based on the advice of experts, Class Counsel formulated a settlement proposal which was communicated to Defendants in January 2006.  That led to the parties' agreement to seek the assistance of Magistrate Judge Jacob P. Hart to attempt to settle the case. The parties then engaged in hard-fought settlement negotiations overseen by Magistrate Judge Hart from early February 2006 to June 2006 before agreeing in principal to the terms of a settlement.  Factual investigation and further negotiations about how to allocate and distribute the settlement proceeds to Class members, as well as negotiations of the precise terms of the Settlement Agreement and its exhibits, continued into early 2007.  The Settlement Agreement was finally executed in late March 2007.[6]

---

[6]    The individual claims of original plaintiff James A. Mehling also were resolved through a confidential individual settlement with the assistance of Magistrate Judge Hart in June 2006.

## II.   THE TERMS OF THE PROPOSED CLASS SETTLEMENT

The principal terms of the proposed Class Settlement are as follows:

### A.   Monetary Payment.

Defendants and/or their insurers will pay the total gross amount of $ 14 million.  (The settlement amount was deposited into an interest-bearing settlement escrow account on or about April 2, 2007 and it has accrued interest of approximately $425,000 since that date.)  Under the supervision of Magistrate Judge Hart, the parties negotiated that 70% of the settlement amount, or $ 9.8 million plus interest, would be allocated to the 401(k) Plans and then distributed to the eligible current and former participants of the 401(k) Plans who had account balances in either 401(k) Plan at any time between January 1, 1994 and December 31, 2005.  The allocation of this settlement money to 401(k) Plans participants will be made according to the proposed Plan of Allocation (Section 4.4 of the Agreement), which is subject to approval by the Court as part of the final approval process.  The balance of the settlement amount, 30% or $ 4.2 million plus interest, will be allocated between the two Pension Plans, as described below.  (The actual amounts allocated to each of the pension and 401(k) Plans will be net of each plan's respective share of the attorneys' fees and expenses to Class Counsel, notice and administrative expenses associated with the settlement, and compensation to named plaintiffs, all as approved by the Court.)

### B.   Distribution of Monetary Payment Allocated to the Pension Plans.

After deducting their allocable shares of Court-approved payments for attorneys' fees and expenses, notice and administrative expenses, and named plaintiffs' compensation, the net settlement amount allocated to the Pension Plans will be divided between the two Pension Plans as follows: 55.283% to the Employees' Pension Plan and 44.717% to the Agents Pension Plan. This pro-ration is based on the total assets in each Pension Plan as of December 31, 2005.  The

net settlement amount that is paid to the two Pension Plans will not increase benefits paid to any individual Class members or any other Pension Plan participants, but will strengthen the funding of the Pension Plans.

**C.      Distribution of Monetary Payment Allocated to the 401(k) Plans and to Eligible 401(k) Plan Class Members**.

After deducting their allocable shares of Court-approved payments of attorneys fees' and expenses, notice and administrative expenses and named plaintiffs' compensation, the net settlement amount allocated to the 401(k) Plans will be further allocated and distributed according to the proposed Plan of Allocation to eligible Class Members who are current or former participants or beneficiaries in either of the 401(k) Plans (EPSI or APSI) who had account balances in either plan at any time between January 1, 1994 and December 31, 2005. 401(k) Plan participants who no longer have an account balance in either of the plans must file a Claim Form in order to receive a settlement distribution.  The Claim Form process is necessary to obtain current address information, tax certifications, and Class member instructions for distribution of settlement payments.  In contrast, 401(k) Plan participants who have a current account balance in one of the plans will receive their settlement payments as an addition to their accounts, so a claims process is not required.

The proposed Plan of Allocation, for which Plaintiffs are seeking final Court approval as part of the Final Order, is discussed in detail in Section IV below.

**D.      Independent Advisor to the Plans**.

Under the proposed Settlement, Defendants also have agreed to significant prospective relief to safeguard the interests of the Class – the Trustees will retain and utilize the services of an Independent Advisor, which will also have fiduciary responsibility to act prudently, to provide advice to the Trustees regarding appropriate investments for each of the Plans,

including appropriate investment options for each of the 401(k) Plans. The Independent Advisor must be retained through May 30, 2010. Defendants have represented, and Class Counsel have confirmed, that the Trustees have previously engaged and currently engage Wilshire Associates to serve in the same capacity as the Independent Advisor for each of the Plans, that Wilshire is independent of NYL and its affiliates, and that Wilshire will serve initially as the Independent Advisor.

       **E.**     **Release and Dismissal of Claims with Prejudice**.

Under the proposed Settlement, upon final approval, the Court will dismiss with prejudice all claims asserted by the named Plaintiffs and all members of the Settlement Class against all Defendants and Related Parties as specified in the Settlement Agreement. In addition, after final approval, each member of the Settlement Class and each of the Plans will be deemed to have released all Defendants and Related Parties from any and all claims that were asserted or might have been asserted in this lawsuit regarding the Pension Plans and the 401(k) Plans arising out of any allegations, facts, occurrences and legal theories asserted or related to the subject matter set forth, alleged or related to this case under federal or state law, including all such claims any member of the Settlement Class might have raised now or in the future. This Release will not affect any other current or future claims that any Settlement Class Member may have regarding his/her past, current or future entitlement to benefits under the Pension Plans or the 401(k) Plans maintained by NYL or any of its subsidiaries.

       **F.**     **Approval of the Settlement by Independent Fiduciaries.**

As a condition of the Settlement, the current Trustees (including current Trustees who are Defendants) have engaged "independent fiduciaries" to act on behalf of each Plan to review the terms of the Settlement and to determine whether it is prudent to release any claims that the Pension Plans and the 401(k) Plans may have in exchange for the consideration provided by the

Settlement.  The fees charged by the independent fiduciaries for their services were paid separately by NYL or by insurance and will not affect the settlement proceeds available to the Plans and the Settlement Class.  The independent fiduciary for the Pension Plans was United States Trust Company, N.A.  The independent fiduciary for the 401(k) Plans was Independent Fiduciary Services, Inc.  Based on their independent review of the Settlement Agreement and court filings and discovery documents, as well as their interviews with counsel for all parties and with Magistrate Judge Hart, both of the independent fiduciaries have determined that it is appropriate for each of the Plans to accept the terms of the Settlement, including the release of their claims as set forth in the Settlement Agreement.  Their determination letters are attached hereto as Exhibit A.

**III.   NOTICE TO THE MEMBERS OF THE SETTLEMENT CLASS**

On October 25, 2007, the Court entered the Preliminary Order which directed the methods of providing notice to the members of the Settlement Class and approved the form of both a Notice to be sent by mail to all Class members in the form attached to the Settlement Agreement as Exhibit 3 (the "Notice") and a summary notice to be published in *USA Today* in the form attached to the Settlement Agreement as Exhibit 5 (the "Summary Notice").

The mailed Notice was mailed on November 19, 2007 to all 45,653 Class members who were identified on detailed Plans participant lists compiled by Defendant NYL from Plan records.  In the case of 20,543 of these Class members who once had, but who no longer maintain, an account balance in either of the 401(k) Plans, the Notice mailing also included a Former 401(k) Plaintiffs Claim Form (as well as a Special Tax Notice explaining tax-related consequences of various settlement payment options).   Like the mailed Notice, the accompanying Claim Form advised that these Class Members must file a completed 401(k) Plan

11

Plaintiff Claim form by March 31, 2008, in order to participate in the distribution pursuant to the Plan of Allocation.[7]   The Summary Notice was published in all United States editions of *USA Today* on November 28, 2007.

The sworn statement of Class Counsel evidencing compliance with these notice-related provisions of Paragraph 5 of the Preliminary Order, as required under Paragraph 6 of the Preliminary Order, will be filed on or before January 11, 2008.

Class Counsel and the Settlement Administrator, Heffler, Radetich & Saitta, LLP, also have leased and maintained a post office box in the name of the litigation for the receipt of all responses to the mailed Notice and Summary Notice, and are preserving all entries of appearance, statements, inquiries, objections, and any other written communications from members of the Settlement Class or any other person in response to the Notices.  These materials will be included in the sworn statement which Class Counsel will file with the Court on January 11, 2008 pursuant to Paragraph 7 of the Preliminary Order.

Finally, Class Counsel and the Settlement Administrator have established and maintained a settlement website, www.nylplanslawsuit.com, providing interested persons with the Notice, Claim Form, current pleadings, and merits rulings for the case.

---

[7]      The October 25, 2007 Preliminary Order, tracking the schedule proposed by Class Counsel, set March 21, 2008 as the deadline date for Claim Forms.  On further consideration, the parties agreed that a slightly later date, March 31, 2008, would be more easily remembered and met by Class members, so the Notice employs the March 31, 2008 date.  Paragraph 13 of the Preliminary Order allows the parties to "agree to reasonable extensions of time to carry out any of the provisions of the Settlement Agreement" without further order of the Court.

IV.   **THE PROPOSED PLAN OF ALLOCATION TO DISTRIBUTE SETTLEMENT FUNDS TO SETTLEMENT CLASS MEMBERS WHO HAD AN ACCOUNT BALANCE IN ONE OF THE 410(k) PLANS.**

The portion of the Settlement funds distributed to the 401(k) Plans, as described in Sections II. A-C above, will be further allocated and distributed according to the proposed Plan of Allocation to eligible Class Members who are current or former participants or beneficiaries in either of the 401(k) Plans who had account balances in either 401(k) Plan at any time between January 1, 1994 and December 31, 2005.   The detailed statement of the proposed Plan of Allocation is set forth in paragraph 4.4 of the Settlement Agreement.   A summary of the proposed Plan of Allocation follows.

In general, the net settlement amount allocated to the 401(k) Plans will be allocated within each 401(k) Plan on a pro rata basis, according to the total of "Allocation Points" assigned to each Eligible Class Member.   The Allocation Points are equal to (1) the dollar amounts, if any, invested only in mutual funds in each Eligible Class Member's individual 401(k) Plan account as of December 31 of each calendar year during the years 1999-2005, and (2) the total dollar amounts, if any, estimated to be held in each Eligible Class Member's individual 401(k) Plan account as of December 31 of each calendar during the years 1994-1998.   Due to limitations in the practical ability to retrieve detailed, annual historic data for tens of thousands of individual account balances during the 1994-98 period, the pro-ration for that period will be based on total account holdings and some uniform rules to estimate annual account balances.   Under the proposed Plan of Allocation, these payments will be subject to a minimum of $50 and a maximum of $1,000 for each Eligible Class Member.

Class Counsel will provide additional information relating to the proposed Plan of Allocation, including individual payout projections, in advance of the January 22, 2008 hearing.

## V.     THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE.

"A class action may not be settled under Rule 23(e) without a determination by the district court that the proposed settlement is 'fair, reasonable and adequate.'"  *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 534 (3d Cir. 2004) *see also* Fed. R. Civ. P. 23(e)(1)(A).  In passing on the adequacy of a settlement under Rule 23(e), the Third Circuit has emphasized that "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members."  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir. 1995).  Approval of a proposed settlement lies in this Court's sound discretion.  *See In re Warfarin,* 391 F.3d at 535; *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir. 1975). "Additionally, there is an overriding public interest in settling class action litigation, and it should therefore be encouraged."  *In re Warfarin,* 391 F.3d at 535.  "A proposed settlement which is negotiated at arms-length by capable counsel after meaningful discovery is presumed to be fair and reasonable."  *In re Gen. Instrument Sec. Litig.,* 209 F. Supp. 2d 423, 429 (E.D. Pa. 2001); *Smith v. Dominion Bridge Corp.*, No. 96-7580, 2007 WL 1101272, at *3 (E.D. Pa. April 11, 2007) (same).

The Third Circuit has identified nine factors which are to be considered when determining whether a proposed class action settlement is fair, reasonable and adequate.  *Girsh v. Jepson,* 521 F.2d at 157.  These factors are:

> (1) [T]he complexity, expense, and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment . . . ; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . .

*Id.*  As discussed below, consideration of these factors leads to the conclusion that the Settlement is "fair, reasonable and adequate" and merits approval by the Court.

> **A.      The First *Girsh* Factor:  The Complexity, Expense, and Likely Duration of the Litigation**

"This factor captures 'the probable costs, in both time and money, of continued litigation.'"  *In re Cendant Corp. Litigation*, 264 F.3d 201, 233 (3d Cir. 2001).  "By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably."  *GM Trucks,* 55 F.3d at 812.

This factor weighs heavily in favor of approving the Settlement.  This case, which has been pending since 1999, has already consumed substantial time and money, as well as judicial resources.  It is likely that if it were to proceed to trial it would consume a significant amount of additional time and money for all parties, with no certainty that there would be a better result for the Class than that which the proposed Settlement is likely to produce.

The Court has already ruled on two motions to dismiss.  *See Mehling I,* 163 F. Supp. 2d 502; *Mehling v. New York Life Ins. Co.*, 413 F. Supp. 2d 476 (E.D. Pa. 2005) ("*Mehling II*"). The Complaint is now in its third iteration.  While Plaintiffs have completed the core fiduciary discovery and conducted a key third-party deposition, considerable further paper and deposition discovery would be necessary in order to adequately establish the knowledge of the NYL monitoring fiduciaries and the extent to which these fiduciaries were aware that the fees charged by the NYL Funds were significantly higher than the fees associated with other suitable investment alternatives available to the Plans.  As noted previously, a lengthy motion to compel discovery of the necessary documentation to help prove this aspect of the case has been briefed and would have to be resolved by the Court before this discovery can be resumed.  Once the

discovery resumed, it would be approximately one year before the discovery would be completed and the case could be tried.

In view of the significant costs which all parties are likely to incur if they continue on the litigation path, there is a substantial benefit to be derived from a negotiated resolution at this time. This is especially true for Plaintiffs and the Class members. As discussed in Section V. H below, the amount that Plaintiffs and the Class can expect to recover following a trial on the merits is not likely to be significantly greater than the current settlement amount and could be far less.

**B.      The Second *Girsh* Factor: The Reaction of the Class to the Settlement**

The Court-ordered Notices, which describe the terms of the Settlement and the manner in which participants may object to the Settlement, were disseminated to the approximately 45,600 members of the Class in the second half of November. *See* Part III, above, which discusses the Notice to the members of the Settlement Class. Thus, it is too early to gauge the reaction of the Class to the Settlement. However, as of the morning of December 10, 2007, no objections to any aspect of the Settlement had been received at the dedicated post office box or through any other means. Any objections or other comments bearing on approval of the Settlement will be filed with the Court on January 10, 2008 as part of the Affidavit of Compliance and addressed at that time.

**C.      The Third *Girsh* Factor: The Stage of the Proceedings and the Amount of Discovery Completed**

"The stage-of-proceedings facet of the *Girsh* test captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *GM Trucks,* 55 F.3d at 813. "[C]ompleted discovery means the parties are more

likely to form an accurate, and thus more convergent, estimate of the likely outcome of the case and potential damages.  Thus, post-discovery settlements are more likely to reflect the true value of the claim and be fair."  *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1314 (3d Cir. 1993).

This factor also strongly supports approval of the Settlement.  Plaintiffs have had the opportunity to review thousands of documents pertaining to Defendants' conduct and consideration of Plan investments and the fees associated with these investments.  The underlying transactions are well-documented and are not disputed.  Additionally, based on the materials obtained through discovery, Class Counsel, with the assistance of experts at Ennis Knupp & Associates and elsewhere, have been able to accurately estimate a potential range of losses suffered by the Plans.  Thus, the completed discovery and financial analysis have enabled Class Counsel to form an accurate assessment of both Defendants' potential exposure and the range of potential damages.

The fact that some document and deposition discovery remains to be completed with respect to other Defendants, including NYL, does not alter the assessment of this *Girsh* factor.  A number of senior executives, whose knowledge can be imputed to NYL, under general agency principles, *see, e.g., In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 905-06 (S.D. Tex. 2004) ("[A]cts of individuals in performing ERISA fiduciary functions while acting in their corporate role are attributable to the corporation."), knew of the advice that DeMarche had given the Trustees.  Thus, even in the absence of further discovery as to NYL's knowledge of other less costly investments that would have been available to the Plans, there is ample evidence for Plaintiffs to assess the relative strength of their claims and of Defendants' defenses.

### D.       The Fourth *Girsh* Factor: The Risks of Establishing Liability

"A court considers this factor in order to 'examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them.'"  *Cendant,* 264 F.3d at 237.  In a case such as this alleging fiduciary breaches, this factor includes consideration of the difficulty the plaintiffs faced in proving allegations of fiduciary breaches.  *See Bell Atlantic Corp.*, 2 F.3d at 1312.  Under this factor even where "plaintiffs hoped to secure a large damage award, this would have to be drastically discounted" when potentially strong defenses may be asserted by the defendants.  *Id.*, 2 F.3d at 1313.  Thus, as discussed below, despite the apparent strength of the fiduciary breach claims asserted here, there exists a significant risk that if the case were litigated to conclusion, the potential defenses available to Defendants would negate or significantly reduce the amount of damages that could be recovered in this case.

First, Plaintiffs may not succeed in establishing that the fees and expenses that Defendants permitted the Plans to pay were actually unreasonable.  The recent decision in *Dupree v. Prudential Ins. Co. of Am.,* No. 99-8337, 2007 WL 2263892, *1 (S.D. Fla. Aug. 10, 2007), illustrates the risks that Plaintiffs face.  As in the present case, the plaintiffs in *Dupree* alleged that the fiduciaries of the Prudential pension plan  improperly used plan assets "as 'seed money' to help Prudential market investment strategies that had not yet attracted other investors," *id.* at *15, and invested plan assets in Prudential "investment strategies . . . having excessive fees."  *Id.* at *41.  As in this case, the documentary evidence seemed to show that the fiduciaries of the Prudential plans had acted imprudently because they had no procedures in place for reviewing proposed investments.  However, the court credited testimony that "detailed investigation and due diligence" was nevertheless performed on each new investment, and

rejected the plaintiffs' claims of imprudence. *Id*. at *15, *47. Thus, despite the fact that the documentary evidence obtained in discovery in this case indicates that the Trustees acted imprudently by investing Plan assets in proprietary NYL Funds and failing to consider other available, less costly investment alternatives, at trial the Court might view this evidence differently.

Similarly, with respect to the question whether the fees charged to the Prudential plan were excessive, the *Dupree* court concluded that it was not unreasonable for the Prudential plan to pay fees of up to "the 75th percentile of all fees paid" for similar investments by other plans, and, in some cases, even above the 90th percentile of fees paid if after-the-fact it appeared an investment had outperformed its benchmark. *Id.* at *24-25 & *47-48. Adoption in this case of such a deferential measure for determining the reasonableness of the fees charged by the NYL Funds could seriously undermine Plaintiffs' claims of fiduciary breach and/or substantially reduce the recoverable losses suffered by the Plans as a result of such breaches.

Second, a considerable portion of Plaintiffs' case – that pertaining to the Pension Plans – is vulnerable to challenge due to the fact that those Plans are now, and were when settlement negotiations began, over-funded, in large part because of contributions in excess of $ 400 million made by NYL in recent years. In this circumstance Defendants can argue that to the extent the Pension Plans were charged excessive fees, any loss that was suffered was to the "plan surplus" and did not jeopardize benefits funding. *See, e.g., Harley v. Minn. Mining and Mfg. Co.*, 284 F.3d 901, 905-07 (8th Cir. 2002) (in the case of a defined benefit plan where as a result of a fiduciary breach "plan assets are depleted but the remaining pool of assets is more than adequate to pay all accrued or accumulated benefits, then any loss is to plan surplus," and there is no "cognizable harm" which is actionable by plan participants). This principle was recently applied

against the plaintiffs in *McCullough v. AEGON USA, Inc.*, No. 06-0068, 2007 WL 3232202 (N.D. Iowa Oct. 30, 2007).

While Class Counsel (and the U.S. Department of Labor) disagree vehemently with the holding and rationale in *Harley* (which has not been endorsed outside of the Eighth Circuit)*, if that case were applied in the present litigation, it could arguably render unrecoverable losses associated with the excessive fee claims with respect to the Pension Plans, since under even the most generous loss assumptions the damages suffered by the Pension Plans do not exceed the surpluses reported by those Plans in recent Form 5500 Annual Reports.

Finally, with respect to the 401(k) Plans, Defendants were likely to argue that use of mutual funds is a common and accepted practice for 401(k) Plans, despite their relative disadvantages when compared to alternative vehicles that could provide the same investment management and individualized account services at less cost.   Although the less costly alternative vehicles are being used by the more sophisticated and better-advised fiduciaries, mutual funds do, in fact, remain common investment vehicles for 401(k) Plans.   If Defendants' argument that the deficiencies of the mutual fund vehicle were not so severe as to preclude their use by a reasonable and well-informed fiduciary, then the recovery for the 401(k) Plans also could be considerably limited or even negated.

### E.        The Fifth *Girsh* Factor: The Risks of Establishing Damages

Like the previous factor, "this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time."  *GM Trucks,* 55 F.3d at 816.  This factor weighs in favor of approval of a settlement where the court is likely to be "confronted with competing expert opinions of corresponding complexity, [and] there is no compelling reason to

think that it would accept Lead Plaintiff's determination rather than [Defendant's]." *Cendant*, 264 F.3d at 239.

As the recent decision in *Dupree* illustrates, the question of whether and to what extent, if any, the investment management fees charged by the NYL Funds were unreasonable are issues that would be the subject of competing expert testimony. The decision in *Dupree* recited lengthy findings based upon the testimony of competing experts, and ultimately the case was resolved adversely to the plaintiffs, in large part because the court credited defendants' expert. *See, e.g.*, *Dupree*, 2007 WL 2263892, *22-26. If the present case were litigated to its conclusion and the Court ultimately rejected the opinions of Plaintiffs' experts, there is a risk that Plaintiffs would recover nothing at all. This all-or-nothing aspect of the case weighs heavily in favor of settlement.

Moreover, even if the Court were to accept the opinions of Plaintiffs' experts and conclude that the Plans' fiduciaries acted imprudently by continuing to invest in NYL Funds when less costly investment strategies would have saved the Plans millions of dollars in fees, there is still likely to be considerable disagreement over the degree to which the fees were excessive and how the losses to the Plans should be calculated.

One of Plaintiffs' experts, Ennis Knupp, a well-regarded investment consulting firm, has calculated that from 1994 to 2005, the total amount of excessive fees which all four Plans paid as the result of Defendants' fiduciary breaches over the entire class period was approximately $ 70 million, exclusive of interest/lost investment return. This number was determined by comparing the fees the four Plans would have incurred if each of them had invested in separately managed accounts throughout the Class Period with the total fees the Plans actually incurred by continuing

to invest in the NYL Funds.  Of this amount approximately $ 20 million related to the 401(k) Plans and $ 50 million related to the Pension Plans.

There also is a risk that the trier of fact might conclude that the Trustees' decision to continue investing in the NYL Funds was consistent with what many other pension managers were doing in the 1990's, and that this practice did not necessarily become imprudent at least *until* DeMarche advised the Trustees in 1999 of the savings they could realize through investing the assets of the Plans in separately managed accounts.  This would effectively cut five recovery years off of Plaintiffs' claims and substantially reduce the losses suffered by the Plans.  Under this scenario, the projected losses to the 401(k) Plans would be reduced to about $ 11 million and the losses suffered by the Pension Plans to about $ 10 million, exclusive of interest.

Also, there is likely to be considerable dispute among the parties' experts, first, about the form the alternative investments should have taken, *i.e.*, separately managed accounts versus non-proprietary, institutional mutual funds which would not have achieved as great a cost savings as separately managed accounts, and, second, as to the exact amount in fees the Plans could have saved had they utilized such alternative strategies.  For example, if the excessive fees are calculated from 1994 to the present based upon a comparison of the fees charged by the NYL Funds with the fees that non-proprietary, institutional mutual funds would have charged, the losses suffered by the Plans are substantially less than if they are based on the savings that could have been achieved by investing in separately managed accounts.   Under this scenario, depending on which mutual fund families are used as the comparison group, the excess fees paid by the 401(k) Plans would range between $ 6.5 and $ 11.5 million and the excess fees paid by the Pension Plans range between $ 17.8 and $ 35 million.

Additionally, because the Plans were smaller in terms of total asset size at the outset of the time frame covered by the litigation, particularly in the case of the 401(k) Plans, Defendants were likely to argue that, at least initially, the cost savings to the Plans by migrating to separately managed accounts or some other alternative investment, such as institutional mutual funds, would not have been adequate to justify the conversion immediately.  If this argument were accepted, this would again limit the period of imprudence and reduce Plaintiffs' total damage calculation.

As the foregoing discussion reflects, the considerable uncertainty and risk in establishing the extent of the losses suffered by the Plans as a result of the fiduciary breaches alleged in the Complaint strongly favors settlement at the present time.

###     F.     The Sixth *Girsh* Factor:  The Risks of Maintaining the Class Action Through the Trial

This is not a risk factor Plaintiffs considered in entering into the Settlement Agreement. On November 2, 2001, the Court certified a stipulated class in this case and there was no concern that Plaintiffs would not be able to maintain the class through a trial, given the indisputably class-wide nature of the claims.   ERISA fiduciary breach claims such as these are "a paradigmatic example of a [Rule 23](b)(1) class . . . [therefore a] class is a perfect vehicle for resolving complex ERISA issues."  *Kolar v. Rite Aid Corp.*, No. 01-1229, 2003 WL 1257272, at *3 (E.D. Pa. Mar. 11, 2003).

###     G.     The Seventh *Girsh* Factor:   The Ability of Defendants to Withstand a Greater Judgment

This was not a factor in Plaintiffs' decision to settle the case.  The Settlement amount was based upon Class Counsel's assessment of the strengths and weaknesses of the case, without regard to NYL's presumed ability to pay the full amount of the largest projected recovery.

**H.    The Eighth and Ninth *Girsh* Factors:   The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation**

The final two *Girsh* factors ask whether a settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial.  In order to assess the reasonableness of a proposed settlement seeking monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement."  *GM Trucks,* 55 F.3d at 806 (*quoting* Manual for Complex Litigation 2d § 30.44, at 252).  As discussed below, this factor clearly favors approval of the Settlement, particularly in light of the fact that the Settlement has been approved by two fiduciaries who are totally independent of the parties to this action.

As noted previously, Plaintiffs' expert Ennis Knupp has calculated that the total amount of excessive fees which all the Plans paid as the result of Defendants' fiduciary breaches over the entire class period from 1994 to 2005 was approximately $ 70 million.  Thus, for purposes of the eighth *Girsh* factor – the range of reasonableness of the settlement fund in light of the best possible recovery – the $ 14.4 million settlement fund generated to date represents a recovery of approximately 20% of the "best possible recovery" assuming that *all* of Plaintiffs' theories of liability and damages were fully accepted by the Court, and without factoring *any* of the risks of litigation.

This figure, however, does not take into account the fact that, while the majority of the excessive fees, over 71%, were paid by the Pension Plans to NYL and its affiliates, the impact of those overpayments has arguably been mitigated by NYL's contributions of over $ 400 million to the Pension Plans during 2004-2006.  Because the amount of such contributions are linked to

24

the pre-existing funding level of a given defined benefit plan (as it would have been impacted by the payment of excessive fees), Defendants would argue that any deficit in funding resulting from payment of excessive fees was offset NYL's later contributions. Rather than being under-funded as a result of paying excessive fees to Plan sponsor NYL, the Pension Plans are currently over-funded. Thus, losses suffered by these Plans as a result of any fiduciary breaches alleged by Plaintiffs are extremely unlikely to affect the funding security of the defined pension benefits that participants are entitled to receive in the future. Due to these different considerations for the two Pension Plans, in allocating the proceeds of the Settlement among the four Plans, only 30% or $ 4.2 million was allocated to the Pension Plans, despite the fact that the Pension Plans had nominally greater losses than the 401(k) Plans. Allocating a large portion of the settlement recovery to the Pension Plans, which together held nearly $ 3.4 billion in assets as of the end of 2005, would have had only a very slight impact on the asset base and funding of the Pension Plans while, in effect, serving to reduce NYL's future obligation to fund the Pension Plans.

In contrast, the $ 9.8 million of Settlement funds that has been allocated to the 401(k) Plans represents a recovery of approximately 49% of the $ 20 million in excessive fees which Plaintiffs calculate those Plans paid over the entire class period. Class Counsel believe that by any measure, a recovery of nearly half of the "best possible recovery" is an excellent result, particularly in the face of the considerable risks to Plaintiffs and the Class on both liability and damages.

As discussed previously, if the Court were to determine that the Trustees acted reasonably, at least until they learned from DeMarche of the availability of separately managed accounts, the 401(k) Plan losses would only be about $ 11 million. Or, if the Court were to conclude that that the 401(k) Plans should have invested in institutional mutual funds instead of

the NYL Funds, the losses would be reduced to between $ 6.5 and $ 11.5 million.  Accordingly, when the risks of litigation and proving damages are taken into account, the recovery achieved for the 401(k) Plans begins to approach or exceed 100% of what the Plaintiffs could have reasonably expected to recover if the case had been litigated to its conclusion.

In this case, there are additional reference points which the Court can consider in assessing the reasonableness of the Settlement.  As discussed previously, the settlement negotiations were overseen by Magistrate Judge Hart, who was very familiar with the claims and defenses and their relative strengths.  Second, two independent fiduciaries were retained by the Plans to review and approve the Settlement.  Because this Settlement, if approved by the Court, would result in the release of claims by the Plans against NYL, the sponsor and a party in interest with respect to the Plans, the settlement could have resulted in a violation of ERISA Sections 406(a)(1)(A), (B) and (D), 29 U.S.C. §§ 1106(a)(1)(A), (B) and (D), unless it had the approval of an independent fiduciary as provided under Prohibited Class Action Exemption 2003-39.  *See* Class Exemption for the Release of Claims, 68 Fed. Reg. 75632.  As a condition of meeting this exemption, the independent fiduciaries were required to consider whether "[t]he settlement is reasonable in light of the plan's likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone," 68 Fed. Reg. 75632, 75639 (December 31, 2003), a consideration which is virtually identical to the ninth *Girsh* factor.  Thus, in the present case, two totally independent fiduciaries which are expert in the field of best investment practices for plan fiduciaries have closely scrutinized the Settlement and confirmed that, as to all of the Plans, it is reasonable in light of the risks of litigation.   The determination letters from both of the independent fiduciaries are attached hereto as Exhibit A.

## CONCLUSION

After eight years of litigation, the parties have agreed to a Settlement which provides a payment to the Plans and the 401(k) Plan participants of $ 14 million plus interest.   The Settlement also provides appropriate injunctive relief to ensure that the Plans do not pay excessive management fees in the future.   This Settlement is an excellent result for the Class and, for all the reasons set forth above, it should be approved.   Plaintiffs respectfully request that the Court enter the Order and Final Judgment granting final approval to the Settlement.

Dated: December 10, 2007

Respectfully submitted,

_____s/ Alan M. Sandals_____
Alan M. Sandals
Scott M. Lempert
**SANDALS & ASSOCIATES, P.C.**
One South Broad Street, Suite 1850
Philadelphia, PA  19107
(215) 825-4000

Eli Gottesdiener
**GOTTESDIENER LAW FIRM, PLLC**
498 7th Street
Brooklyn, NY  11215
(718) 788-1500

Marc I. Machiz
**COHEN, MILSTEIN, HAUSFELD
   & TOLL, PLLC**
One South Broad Street, Suite 1850
Philadelphia, PA  19107
(215) 825-4010

Barry L. Gross
**STIEF, GROSS, SAGOSKIN, GILMAN
   & CLASSETTI PC**
P.O. Box 274
Newtown, PA  18940-0274
(215) 968-3900

Counsel for Plaintiffs and the Settlement Class

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of the foregoing PLAINTIFFS' MOTION AND SUPPORTING MEMORANDUM FOR ENTRY OF ORDER AND FINAL JUDGMENT GIVING FINAL APPROVAL TO PROPOSED CLASS ACTION SETTLEMENT to be served by ECF Filing and by first class mail this <u>10th</u> day of December, 2007, upon the following counsel:

Michael L. Banks
Joseph J. Costello
**MORGAN, LEWIS & BOCKIUS, LLP**
1701 Market Street
Philadelphia, PA  19103

Stephen M. Saxon
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Avenue, N.W.
Washington, DC  20006

Attorneys for Defendants

_____s/ Alan M. Sandals_____
Alan M. Sandals