**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES A. MEHLING, et al.** | _____ : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 99-5417** |
| | : | |
| **NEW YORK LIFE INSURANCE CO., et al.** | : | |

**MEMORANDUM AND ORDER**

Kauffman, J.                                                    March   4,  2008

Now before the Court are Plaintiffs' Motion for Entry of an Order and Final Judgment

Giving Final Approval to the Proposed Class Action Settlement (the "Motion") and Class

Counsel's Petition for an Award of Attorneys' Fees and Reimbursement of Expenses and for

Special Payments to Named Plaintiffs Maane and Bowers (the "Petition").  For the reasons

discussed below, the Motion and the Petition will be granted.

## I.      BACKGROUND

Defendant New York Life Insurance Company ("NYL") at all times relevant to this

litigation maintained Pension Plans and 401(k) Plans (collectively, the "Plans") for its

employees.  Plaintiffs are former and current NYL employees and agents who participated in the

Plans.[1]  The Pension and 401(k) Plans are managed by the same Board of Trustees, also named as

---

[1]      Plaintiffs also bring this action on behalf of the Plans.  Two of the Plans—the
New York Life Insurance Company Pension Plan (the "Employee Pension Plan") and the NYLIC
Retirement Plan (the "Agent Pension Plan")—are defined benefit pension plans.  The remaining
two Plans—the New York Life Insurance Company Employee Progress Sharing Investment Plan
and the New York Life Insurance Agent Progress Sharing Plan—are defined contribution 401(k)
savings plans.

-1-

a Defendant.  According to Plaintiffs, the Board of Trustees improperly invested assets of the Plans into NYL-owned mutual funds.  This investment caused the Plans to pay excessive investment management fees and expenses.  Plaintiffs allege that even when an independent consultant advised the Board of Trustees that the Pension Plans could save over $7 million in fees by moving their investments from the proprietary funds to a separately managed program, the Trustees failed to take action until the instant suit was filed.[2]  Defendants' alleged breach of their ERISA-imposed fiduciary duties to the Plans and Plan participants gave rise to the instant litigation.

Plaintiffs filed the original Complaint on November 1, 1999, the First Amended Complaint on June 14, 2000, and the Second Amended Complaint on July 25, 2000.  After the Court dismissed several counts of the Second Amended Complaint on March 29, 2001, Plaintiffs filed a Third Amended Complaint on May 7, 2002, and then a Revised Third Amended Complaint on February 20, 2003.  The Revised Third Amended Complaint alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq.  However, on July 13, 2005, this Court dismissed Plaintiffs' RICO claims, leaving only the ERISA counts in the Revised Third Amended Complaint.  Thereafter, the parties began negotiating a settlement in a process overseen by Magistrate Judge Jacob P. Hart.  On March 22, 2007, the parties executed the Settlement Agreement.  On October 25, 2007, the Court granted

---

[2]      Plaintiffs allege that although the Board of Trustees eventually moved the Pension Plans' assets into suitable investment vehicles, it continued to offer NYL funds exclusively as investment options to the 401(k) Plan participants, causing them to incur millions of dollars in excessive fees.

preliminary approval of the Settlement Agreement and certified a modified settlement class.[3]

Plaintiffs were ordered to give notice of the Settlement Agreement to all class members.  A final

settlement approval hearing was held on January 22, 2008.


## II.    THE SETTLEMENT AGREEMENT

Under the Settlement Agreement, Defendants and/or their insurers will pay a total gross

amount of $14,000,000,[4] 70% of which (equal to $9.8 million plus interest) will be distributed to

the eligible current and former participants of the 401(k) Plans who had account balances at any

time between January 1, 1994 and December 31, 2005.  The remaining 30% (equal to $4.2

million plus interest) will be allocated between the Employee Pension Plan and the Agent

Pension Plan.[5]  After Court-approved payments of attorneys' fees and expenses, administrative

---

[3]    The modified settlement class is defined as follows:
(a) all persons, other than Defendants, who were participants as of December 31, 2005 in the New York Life Insurance Company Pension Plan or the Nylic Retirement Plan, including (I) beneficiaries of deceased participants who, as of December 31, 2005, were receiving benefit payments or will be entitled to receive benefit payments in the future, and (ii) alternate payees under a Qualified Domestic Relations Order who, as of December 31, 2005, were receiving benefit payments or will be entitled to receive benefit payments in the future; and (b) all persons, other than Defendants, who have been participants or beneficiaries in either the Employees 401(k) Plan or the Agents 401(k) Plan and had account balances in either plan at any time between January 1, 1994 and December 31, 2005.

[4]    This amount was deposited into an interest-bearing escrow account on or about April 2, 2007, and has accrued interest of approximately $425,000.

[5]    The actual amounts allocated to each of the 401(k) and Pension Plans will be net of each plan's respective share of the attorneys' fees and expenses to Class Counsel, notice and administrative expenses associated with the settlement, and compensation to Named Plaintiffs. These fees and expenses are addressed in Section VI, infra.

expenses, and Named Plaintiffs' compensation, the settlement amount for the Pension Plans will be allocated 55.283% to the Employee Pension Plan and 44.717% to the Agent Pension Plan. These funds will not be distributed to individual class members but will be used to strengthen the funding of Pension Plans.

Additionally, Defendants have agreed to provide prospective relief to safeguard the interests of the class members. The Trustees of the Plans will utilize an independent advisor to provide advice regarding appropriate investments for each of the Plans. The independent advisor will be retained through May 30, 2010.

All claims asserted by the Named Plaintiffs and the Settlement Class against Defendants and all Related Parties as specified in the Settlement Agreement will be dismissed with prejudice. Additionally, the Plans and the Settlement Class will be deemed to have released Defendants and all Related Parties from any and all claims that were asserted or that might have been asserted arising out of the facts of the instant case.

Finally, as a condition of the Settlement, the current Trustees of the Plans have engaged two independent fiduciaries to advise whether the Plans should release the claims in exchange for the Settlement benefits. The parties retained Independent Fiduciary Services, Inc. to review the Settlement on behalf of the 401(k) Plans, and U.S. Trust Co. to review the Settlement on behalf of the Pension Plans. After reviewing all relevant documents and interviewing counsel for all parties and Magistrate Judge Hart, the independent fiduciaries have opined that the Settlement Agreement is fair, adequate, and reasonable. See Letters from Independent Fiduciary Services, Inc. & U.S. Trust Co., attached to the Motion at Ex. A.

-4-

**III.    NOTICE TO MEMBERS OF THE SETTLEMENT CLASS**

As directed by the Court's October 25, 2007 Order, Class Counsel mailed Notice to all 45,643 Class Members based on records compiled by NYL.  In the case of the 20,543 Class Members who no longer maintain an account balance in the 401(k) Plans, the mailing also included a 401(k) Claim Form (including a special tax notice explaining tax-related consequences of the settlement payment options).[6]  Class Counsel and the Settlement Administrator have maintained the settlement website www.nylplanslawsuit.com, which provides interested persons with a copy of the Notice, the 401(k) Claim Form, current pleadings, and significant rulings in the case.  A summary of the Notice was published in all United States editions of USA Today on November 28, 2007.

A total of 4,359 Notices have been returned as undeliverable.  Of these returned Notices, the Settlement Administrator obtained updated addresses for 3,843 recipients and resent the Notices to the new addresses.  Of the resent Notices, 96 were returned as undeliverable.  The 612 Notices that remain undeliverable represent 1.34% of the 45,643 members of the Settlement Class; the remaining 98.66% received the Notice by first-class mail.  As of January 22, 2008, there were no objections to the proposed settlement, and only one member of the Settlement Class has attempted to opt out.[7]  Finally, as of January 22, 3,421 401(k) Claim Forms have been

---

[6]    401(k) Plan participants who no longer have an account balance must submit the 401(k) Claim Form to receive a settlement distribution.

[7]    Settlement Class member Julia Guidry, in a one-sentence note dated November 26, 2007, stated: "This is to inform you that I wish to be excluded from the above case." Although the Settlement Class is a non-opt out class, her decision not to file a 401(k) Claim Form is the functional equivalent of an exclusion from any settlement benefits.

received.[8]


## IV.    APPROVAL OF THE SETTLEMENT

The approval of a class action settlement depends on "whether the settlement is fair, adequate, and reasonable."  Walsh v. Great Atl. & Pac. Tea Co., 726 F.2d 956, 965 (3d Cir. 1983).  The Third Circuit has emphasized that in determining the fairness of a proposed settlement, "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members."  In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785 (3d Cir. 1995) (quoting Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975)).  As explained in the Manual for Complex Litigation:

> Judicial review [of a proposed class settlement] must be exacting and thorough.  The task is demanding because the adversariness of litigation is often lost after the agreement to settle.  The settling parties frequently make a joint presentation of the benefits of the settlement without significant information about any drawbacks.  If objectors do not emerge, there may be no lawyers or litigants criticizing the settlement or seeking to expose flaws or abuses.

Manual for Complex Litigation (Fourth) § 21.61, at 309 (2004).  Although the Court must scrutinize the Settlement Agreement for fairness, "there is an overriding public interest in settling class action litigation, and it should therefore be encouraged."  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004).  Moreover, "[a] proposed settlement which is negotiated at arms-length by capable counsel after meaningful discovery is presumed to be fair and reasonable."  In re Gen. Instrument Sec. Litig., 209 F. Supp. 2d 423, 429 (E.D. Pa. 2001); see also In re Gen. Motors Corp., 55 F.3d at 785 (explaining that a settlement is presumed to be fair

---

[8]     Class Counsel expect additional forms before the deadline of March 31, 2008.

when "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected").

The Third Circuit has set forth a non-exhaustive list of factors to consider in determining whether a proposed class action settlement is fair, adequate, and reasonable: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975).[9]

---

[9]       Other relevant factors include:
The maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.
In re Prudential Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 323 (3d Cir. 1998). Of the factors relevant to this case, and as discussed infra, the Court finds that the underlying claims are "mature" and that both the provision for attorneys' fees and the procedure for processing individual claims are fair, adequate, and reasonable.

### A.  Complexity, Expense, and Likely Duration of the Litigation

"This factor is intended to capture 'the probable costs, in both time and money, of continued litigation.'"  In re Gen. Motors Corp., 55 F.3d at 812 (quoting Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 801 (3d Cir. 1974)).  The case has been pending since 1999 and has included two rulings on motions to dismiss.  Plaintiffs represent that further discovery would be required if the case were to proceed to trial, and discovery could only resume after the Court ruled on an extensive motion to compel.  Once discovery resumed, Plaintiffs estimate that it would take approximately one year to prepare for trial.  Given the length of time and the substantial expense required to resolve this matter through continued litigation, the Court finds that this factor favors approval of the Settlement Agreement.  See In re Warfarin, 391 F.3d at 536 (upholding the district court's finding that this factor favored settlement "because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial").

### B.  Class Reaction

As of January 22, 2008, no objection has been filed by any class member.  The sole response received was a request to opt out of the Settlement Agreement.  Given the large number of Settlement Class members, this factor weighs in favor of approval.  See, e.g., In re Linerboard Antitrust Litig., 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("The attitude of class members toward the partial settlement of this action, as evidenced by the absence of objections, strongly militates a finding that the settlement is fair and reasonable."); In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 530 (E.D. Pa. 1990) ("Both the utter absence of objections and the nominal number of shareholders who have exercised their right to opt out of this litigation

militate strongly in favor of approval of the settlement.").

**C.  Stage of the Proceedings/Amount of Discovery Completed**

"The stage-of-proceedings facet of the <u>Girsh</u> test captures the degree of case development that class counsel have accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  <u>In re Gen. Motors Corp.</u>, 55 F.3d at 813.  Plaintiffs have reviewed thousands of relevant documents, permitting them to estimate an accurate potential range of losses suffered by the Plans.  Although discovery is not complete, Plaintiffs represent that key documents have been obtained, giving them the ability to weigh the strengths of their claims and of Defendants' possible defenses.  Given the amount of discovery completed, the Court finds that both parties had sufficient evidence to conduct meaningful, arms-length negotiations reflecting the relative strengths of the claims.  <u>See, e.g.</u>, <u>In re Elec. Carbon Prods. Antitrust Litig.</u>, 447 F. Supp. 2d 389, 400 (D.N.J. 2006) ("Where [the] negotiation process follows meaningful discovery, the maturity and correctness of the settlement become all the more apparent." (citing <u>In re Linerboard</u>, 292 F. Supp. 2d at 640)).

**D.  Risks of Establishing Liability**

"By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them."  <u>In re Gen. Motors Corp.</u>, 55 F.3d at 814 (citing <u>In re Baldwin-United Corp.</u>, 105 F.R.D. 475, 482 (S.D.N.Y. 1984)).  Plaintiffs assert three main risks of establishing liability in this case.  First, they argue that while they have documentary evidence demonstrating that Defendants permitted the Plans to pay unreasonable fees, the Court could

credit testimony from Defendants that detailed investigation and due diligence were performed

on all investments, thus negating Plaintiffs' breach of fiduciary duty claim.  Likewise, the Court

could adopt a deferential measure for determining the reasonableness of fees charged by the NYL

investment funds, which would also undermine Plaintiffs' claims.  See Dupree v. Prudential Ins.

Co. of Am., 2007 U.S. Dist. LEXIS 57857, at *81-82, *132 (S.D. Fla. Aug. 7, 2007) (concluding

that investment management fees at the 75th percentile of all fees for similar investments were

reasonable and that fees above the 90th percentile for high-performing investments were also

reasonable).

   Second, because the Pension Plans (but not the 401(k) Plans) are currently "overfunded"

due to recent contributions by NYL, Defendants could argue that even if the Pension Plans were

charged excessive fees, any loss suffered was to the Plans' surplus and did not endanger benefits

funding.  See Harley v. Minn. Mining and Mfg. Co., 284 F.3d 901, 905-07 (8th Cir. 2002)

(finding that where a fiduciary breach depletes a defined benefit plan's funding, but the

remaining pool of assets is more than sufficient to pay all benefits, there is no cognizable harm to

the plan participants).  While the Harley rationale has not been addressed by the Third Circuit, it

arguably reflects the risk that the fees charged to the Pension Plans could be considered

unrecoverable loss to the surplus.  See McCullough v. Aegon USA, Inc., 2007 U.S. Dist. LEXIS

80375, at *34-35 (N.D. Iowa Oct. 30, 2007) (finding that a defined benefit plan participant

lacked standing because a loss of "millions of dollars in investment management fees" did not

harm his benefits under the overfunded plan).

   Third, with respect to the 401(k) Plans, Defendants could argue that even though

alternative investment vehicles could have proven less costly to the Plans, the use of mutual

funds such as those in this case is generally common for 401(k) plans.  If Defendants can prove that use of the mutual funds was not so deficient as to preclude their use by a reasonable fiduciary, any recovery for the 401(k) Plans could be limited or negated.

Although the Court does not rule on the merits of these possible defenses in the circumstances of this case, it agrees with Class Counsel that Plaintiffs would face serious legal challenges if the case were litigated rather than settled.  See In re Aetna Inc. Sec. Litig., 2001 U.S. Dist. LEXIS 68, at *28 (E.D. Pa. Jan. 4, 2001) ("When considering this factor, the court should avoid conducting a mini-trial.  Rather the court may 'give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'" (quoting In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 181 (E.D. Pa. 2000))).  Thus, this factor also weighs in favor of settlement.

**E.  Risks of Establishing Damages**

Class Counsel argue that because proving damages would involve a "battle of the experts" on complex factual questions such as the total amount of excessive fees charged to the Plans, there is no guarantee that the Court would accept their estimate of damages over Defendants' estimate.[10]  See In re Cendant Corp. Litig., 264 F.3d 201, 239 (3d Cir. 2001) (finding no error in the district court's determination "that establishing damages at trial would lead to a 'battle of experts,' with each side presenting its figures to the jury and with no guarantee

---

[10]     Plaintiffs' expert has calculated that from 1994 to 2005, the total amount of excessive fees paid by the Plans was approximately $70 million, exclusive of interest and lost investment return.  This amount was determined by comparing the fees the Plans would have incurred if each of them had invested in separately managed accounts throughout the class period with the fees the Plans actually incurred by continuing to invest in NYL Funds.

whom the jury would believe").  Additionally, Plaintiffs anticipate disputes about the form any alternative investments should have taken and the precise amount of money the Plans could have saved had they utilized such alternatives.  Finally, the dispute over when use of the NYL funds became imprudent could reduce a damages calculation.[11]  Thus, even if liability were established, determining the amount of loss to the Plans would be complex and highly contested.  Accordingly, the Court finds that this factor also favors settlement.

### F.  Risks of Maintaining the Class Action Through Trial

This is not a risk factor that Plaintiffs considered in entering into the Settlement Agreement.  On November 2, 2001, the Court certified a stipulated class, and Plaintiffs had no concern that they would not be able to maintain the class through trial because they believe the underlying claims are necessarily class-wide in impact.  "While decertification is always a possibility given the conditional nature of all class action certifications," In re Aetna, 2001 U.S. Dist. LEXIS 68, at *27, the Court finds that this factor is neutral in the Girsh analysis.  See In re Prudential, 148 F.3d at 321.

### G.  Ability of Defendants to Withstand a Greater Judgment

Plaintiffs explain that the Settlement Agreement was based on an assessment of the strengths and weaknesses of the case without regard to NYL's presumed ability to pay the full amount of a greater judgment.  While this factor weighs slightly against settlement, given the aforementioned risks in proving liability and damages, the Court does not afford it significant

---

[11]        If, for example, the Court concluded that use of the NYL Funds did not become imprudent until after 1999, when an independent consultant advised Defendants of savings they could realize by using separately managed accounts, Plaintiffs' projected losses would be reduced to approximately $21 million, exclusive of interest.

weight.  See, e.g., Yong Soon Oh v. AT&T Corp., 225 F.R.D. 142, 150-51 (D.N.J. 2004)

(finding that although the defendant could have withstood a greater judgment, "difficulties the

plaintiffs would have had in certifying a damages class and proving damages diminish the

importance of this factor").

### H.  Comparison of the Settlement to the "Best Possible" Recovery

As noted above, Class Counsel estimate that the full amount of excessive fees the Plans

paid during the class period from 1994 to 2005 was $70 million.[12]  Accordingly, the Settlement

Agreement fund of $14.4 million represents approximately 20% of the "best possible" recovery if

all theories of recovery and damages were accepted by the Court.[13]  The Settlement Agreement

also provides for prospective non-monetary relief in the form of an independent advisor to the

Board of Trustees.  Judged solely by the Settlement Agreement's monetary recovery, the result is

comparable to other class settlements approved in this District.  See, e.g., In re Corel Corp. Sec.

Litig., 293 F. Supp. 2d 484, 490 (E.D. Pa. 2003) (approving a settlement amounting to 15% of

provable damages); Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 144 (E.D. Pa. 2000) ("The

settlement that was achieved represents approximately seventeen percent of single damages to

the class, an amount significantly higher than the proportion of damages obtained in settlement

agreements approved by other courts." (citing In re Crazy Eddie Sec. Litig., 824 F. Supp. 320,

---

[12]     This figure is based on an estimated $20 million in excessive fees paid by the
401(k) Plans and an estimated $50 million in excessive fees paid by the Pension Plans.

[13]     Plaintiffs also emphasize that $9.8 million of the total recovery will be allocated
to the 401(k) Plans, representing a recovery of approximately 49% of the $20 million in
excessive fees paid by these plans.  Because, as explained above, the Pension Plans are currently
overfunded, the impact of the excessive fees on these plans is lessened, justifying the lower
recovery of $4.2 million for the Pension Plans.

324 (E.D.N.Y. 1993))).

### I. Comparison of the Settlement to a Possible Recovery in Light of Risks

As discussed above, the risks of litigation could have negated or reduced any possible recovery. Significantly, the settlement process was overseen by Magistrate Judge Hart, who was familiar with the relative strengths and weaknesses of the parties and who took an active role in the numerous settlement negotiations. Moreover, two independent fiduciaries have approved the Settlement Agreement as fair, adequate, and reasonable after reviewing all relevant documents, interviewing counsel for both parties as well as Magistrate Judge Hart, and evaluating the strengths and weaknesses of the arguments on which Plaintiffs' claims were based. As the Third Circuit has explained, the Court must "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." In re Gen. Motors Corp., 55 F.3d at 806. Given the totality of the factors discussed above, the Court approves the Settlement Agreement as fair, adequate, and reasonable.

### V.      APPROVAL OF THE PLAN OF ALLOCATION

"Approval of a plan of allocation of a settlement fund in a class action is 'governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.'" In re Ikon, 194 F.R.D. at 184 (quoting In re Computron Software, 6 F. Supp. 2d 313, 321 (D.N.J. 1998)); see also Walsh, 726 F.2d at 964 ("The court's principal obligation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund."). Generally, a plan that reimburses class members

-14-

based on the nature and extent of their injuries is considered reasonable.  In re Ikon, 194 F.R.D.

at 184 (citing In re Computron, 6 F. Supp. 2d at 321).

After Court-approved payments of attorneys' fees and expenses, administrative expenses,

and Named Plaintiffs' compensation, the net amount allocated to the 401(k) Plans will be

distributed to individual beneficiaries who had account balances in either of the 401(k) Plans at

any time between January 1, 1994 and December 31, 2005.[14]  Class Counsel estimate that after

attorneys' fees, expenses, and awards to the Named Plaintiffs, approximately $6.8 million will be

available for distribution to 401(k) Plan participants.  Pursuant to the Plan of Allocation, the

distribution will be made on a pro rata basis, subject to a $50 minimum and a $1,000 maximum

for each eligible class member.  The funds will be applied first to make all minimum $50

payments and all maximum $1,000 payments, and the balance will be distributed among the

401(k) Plan participants who are entitled to more than the minimum payment but less than the

maximum payment.  This distribution will be based on an individual's total number of

"allocation points," which are equal to (1) the sum of any dollar amounts invested in each

eligible class member's 401(k) Plan as of December 31 of each calendar year during 1999-2005,

plus (2) the sum of the overall dollar amounts estimated to be held in each member's 401(k) Plan

as of December 31 of each calendar year during 1994-1998.

Because 401(k) claim forms are not due until March 31, 2008, the parties cannot

determine the final aggregate number of allocation points and the corresponding distribution

amounts until after that date.  However, at the January 22 hearing, Class Counsel provided

---

[14]     As explained above, the portion of the settlement paid to the Pension Plans will
not increase benefits to any plan participant, but will instead be used to increase the funding of
the Pension Plans.

estimates of the average payout for current 401(k) Plan participants and former Plan participants based on models in which different numbers of former Plan participants file claim forms representing different percentages of the total number of allocation points attributable to former account holders.  Class Counsel provide two models to demonstrate how the number of completed 401(k) Claim Forms will affect the pro rata distribution.  Model 1 assumes that 20% of former account holders will file claims representing 25% of the total allocation points attributable to all former account holders.  Under this model, the average payout is $753.17 for current Plan participants and $206.21 for former participants.  Model 2 assumes that 33% of former account holders will file claims representing 45% of the total allocation points attributable to former account holders.  In this scenario, the average payout is $649.54 for current participants and $194.02 for former participants.[15]

The Plan allocates the losses to the Plan Participants using a formula that approximates an individual participant's loss based on the total amount of money he or she had in the 401(k) Plan for each calendar year.  The independent fiduciary retained to review the adequacy of the Settlement Agreement for the 401(k) Plans has also concluded that the Plan of Allocation is reasonable.  See Letter from Independent Fiduciary Services, Inc. ¶ ii.  Because it reimburses 401(k) Plan Members based on the estimated amount of loss suffered by each individual,[16]

---

[15]     The number of class members affected by the $50 minimum and $1,000 maximum also varies under each model.  Generally, as the number of filed 401(k) Claim Forms increases, the number of persons receiving the minimum payment will increase, while the number of persons receiving the maximum payment will decrease.

[16]     Due to the $50 minimum and $1,000 maximum recovery, not all 401(k) Plan participants will recover amounts based strictly on the pro rata formula.  However, the independent fiduciary reviewing the Settlement on behalf of the 401(k) Plans found that the $50 floor and the $1,000 cap "are not inherently unreasonable given that neither the floor nor the cap

-16-

because no class member has objected, and because an independent fiduciary has found it to be
reasonable, the Court finds the Plan of Allocation to be fair, adequate, and reasonable.

## VI.   PETITION FOR ATTORNEYS' FEES, EXPENSES, AND SPECIAL PAYMENTS

Class Counsel seek attorneys' fees of $4.2 million, 30% of the $14 million settlement.[17]
They also seek reimbursement of litigation costs and expenses in the amount of $208,207.96 and
special payments to Named Plaintiffs Maane ($15,000) and Bowers ($7,500).

### A.  Attorneys' Fees

In class action cases, counsel who recover a common fund settlement such as this are
entitled to reasonable attorneys' fees paid from the fund.  See, e.g., Boeing Co. v. Van Gemert,
444 U.S. 472, 478 (1980).  Of the two methods to analyze fee requests in class actions—the
lodestar method and the percentage of recovery method—the percentage of recovery method "is
generally favored in common fund cases because it allows courts to award fees from the fund 'in
a manner that rewards counsel for success and penalizes it for failure.'"  In re Rite Aid Corp. Sec.
Litig., 396 F.3d 294, 300 (3d Cir. 2005) (quoting In re Prudential, 148 F.3d at 333).  The lodestar
method can be used as a cross-check to verify that the fee award is not excessive.  See id. at 305.

#### 1.  Percentage of Recovery

In common fund cases, a number of factors guide the Court's determination of a
reasonable percentage-based award:

---

will affect the total amount of the recovery."  Letter from Independent Fiduciary Services, Inc. ¶
ii.

[17]    Defendants agreed to take no position with regard to a fee request as long as the
request does not exceed 33% of the settlement fund.

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000).  The relative importance of each factor will vary based on the facts of the case.  See id.[18]

_____ **a. Size of the Fund and Number of Persons Benefitted**

"The size of the fund and the number of persons benefitted is an important factor in setting attorneys' fees because attorneys should be rewarded for procuring a successful result for the class." In re Cell Pathways, Inc., 2002 U.S. Dist. LEXIS 18359, at *23 (E.D. Pa. Sept. 23, 2002).  In this case, the fund has a principal value of $14 million, and the Settlement Class is comprised of approximately 45,600 persons.  As discussed above, the Settlement Agreement represents a successful result for the class.  Accordingly, this factor weighs in favor of approval of the Petition.

_____

[18]     The Third Circuit has identified three other potentially relevant factors in determining the fairness of a fee petition:

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations . . . ; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained . . . ; and (3) any "innovative" terms of settlement.

In re AT&T Corp. Sec. Litig., 455 F.3d 160, 165 (3d Cir. 2006) (citations omitted).  The 30% fee requested here is consistent with private contingent fee arrangements in this District.  See, e.g., Bradburn Parent Teacher Store, Inc. v. 3M, 513 F. Supp. 2d 322, 340 (E.D. Pa. 2007) (finding a fee of 35% to be consistent with private contingent fee arrangements); In re Ikon, 194 F.R.D. at 194 ("[I]n private contingency fee cases . . . plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery.").

### b.  Objections

There have been no objections to the Petition.[19]  This factor weighs in favor of approval.

See, e.g., Bradburn, 513 F. Supp. 2d at 338 ("We find that the total absence of objections to the

requested fees weighs in favor of finding that the percentage of the settlement fund requested is

appropriate."); In re Rent-Way Sec. Litig., 305 F. Supp. 2d 491, 515 (W.D. Pa. 2003) ("[T]he

absence of substantial objections by other class members to the fee application supports the

reasonableness of Lead Counsels' request."); In re Cell Pathways, 2002 U.S. Dist. LEXIS 18359,

at *24 (noting that only one objection to a fee request demonstrates "that the class views the

settlement as a success, and . . . that the class does not object to the thirty percent requested by

the attorneys").

### c.  Skill and Efficiency of the Attorneys Involved

The quality of representation in this case is "measured by 'the quality of the result

achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience

and expertise of the counsel, the skill and professionalism with which counsel prosecuted the

case and the performance and quality of opposing counsel.'"  In re Ikon, 194 F.R.D. at 194

(quoting In re Computron, 6 F. Supp. 2d at 323)).  Both Plaintiffs and Defendants have been

represented vigorously and effectively throughout this litigation.  Class Counsel have submitted

declarations and affidavits detailing their extensive experience in ERISA litigation.  See Decls. of

Marc I. Machiz, Eli Gottesdiener, & Michael D. Lieder, attached to the Petition at Exs. B, C, F;

Affs. of Alan M. Sandals & Barry L. Gross, attached to the Petition at Exs. D, E.  Thus, this

---

[19]     The Notice sent to class members informed them that the fee request would not
exceed $4.2 million.

factor also weighs in favor of approval of the Petition.

### d.  Complexity and Duration of the Litigation

This litigation has been hard-fought for 8 years and has involved complex issues under

ERISA.  The Court ruled on two extensive motions to dismiss, and Magistrate Judge Hart held

numerous settlement conferences in which the parties negotiated at arms length.  Class Counsel

reviewed thousands of pages of documents and relied on sophisticated consulting experts to

determine the facts relevant to their claims.  Given the amount of time involved and the

complexity of the underlying claims, the Court finds that this factor also favors approval of the

Petition.  See In re Linerboard Antitrust Litig., 2004 U.S. Dist. LEXIS 10532, at *34 (E.D. Pa.

June 2, 2004) (finding that this factor weighed in favor of approving a 30% fee where the

underlying litigation had been ongoing for six years).

### e.  Risk of Nonpayment

Because Class Counsel undertook representation on a wholly contingent basis, they have

not been compensated for any of the considerable hours devoted to this case.  Given the

uncertainty of outcome of this complex ERISA action, there was a substantial risk of no

payment.  Accordingly, this factor weighs in favor of approval of the Petition.  See In re Unisys

Corp. Retiree Med. Benefits ERISA Litig., 886 F. Supp. 445, 478 (E.D. Pa. 1995) (explaining

that class counsel in an ERISA action "assumed substantial risks" in expending thousands of

hours "on a contingency basis, without guarantee of remuneration").

### f.  Amount of Time Devoted by Plaintiffs' Counsel

Class Counsel have devoted over 8,400 hours of attorney and paralegal time.  The amount

of time expended supports the reasonableness of the fee request.  See, e.g., In re Rent-Way, 305

F. Supp. 2d at 516 (approving a 25% fee request where, inter alia, plaintiffs' counsel "have collectively expended over 7,958 hours on this case.  By any measurement, this represents a significant investment of time, personnel and resources that have been diverted from other legal matters."); In re Corel, 293 F. Supp. 2d at 496-97 (approving a 33.3% award where, inter alia, plaintiffs' counsel spent 5,754.15 hours on the case and demonstrated "a substantial commitment to this litigation").

### g.  Awards in Similar Cases

The percentage of recovery requested for the fee award is consistent with the awards approved in this District for settlement funds of comparable size.  See, e.g., Bradburn, 513 F. Supp. 2d at 341-42 (approving a 35% award for a $39,750,000 common fund); In re Corel, 293 F. Supp. 2d at 497-98 (approving a 33.3% award for a $7,000,000 common fund); In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 533-34 (E.D. Pa. 1990) (approving a 25% award for a $22,769,000 common fund); see also The Manual for Complex Litigation (Fourth) § 14.121, at 188 ("Attorney fees awarded under the percentage method are often between 25% and 30% of the fund.").

### 2.  Lodestar Cross-Check

"A court determines an attorney's lodestar award by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer."  Gunter, 223 F.3d at 195 n.1.  Class Counsel have submitted affidavits and declarations demonstrating that the total lodestar in this case is $3,605,329.00 and that the multiplier is

1.165.[20]  A lodestar multiplier is designed "to reflect 'the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation.'"  In re Cendant Corp., 232 F. Supp. 2d 327, 340-41 (D.N.J. 2002) (quoting In re Safety Components Int'l, Inc. Sec. Litig., 166 F. Supp. 2d 72, 103 (D.N.J. 2001)).  The Third Circuit has noted that multipliers ranging from one to four are awarded frequently in common fund cases.  See In re Cendant Corp. Prides Litig., 243 F.3d 722, 742 (3d Cir. 2001).  Given the complexity of this litigation, the efforts of and substantial risks assumed by Class Counsel, and the significant monetary and non-monetary benefits resulting from the settlement, the Court finds that this comparatively low multiplier is reasonable.  See, e.g., In re AT&T, 455 F.3d at 173 (finding a multiplier of 1.28 to be "well within a reasonable range" given the complexity of the case and the effort devoted by class counsel); In re Ikon, 194 F.R.D. at 195 ("A multiplier of 2.7 is well within the range of those awarded in similar cases . . . particularly given the substantial risk undertaken by class counsel, the large amounts of attorney time and money expended, and the excellent result obtained for the class." (citation omitted)).  Moreover, the two independent fiduciaries have also determined that the requested fee is reasonable, providing further support for approval of the Petition.  Accordingly, based on an analysis of the Gunter factors as well as the lodestar cross-check, the Court approves the Petition.

---

[20]     Class Counsel have submitted affidavits and declarations with billing records for the five law firms that performed work on this case.  These records document each law firm's hours as well as the hourly rate charged by the employees of each firm.  Each firm's rates are based on the standards of their respective markets, and "[e]ach attorney's hourly rates were appropriately calculated by reference to current rather than historic rates."  In re Ikon, 194 F.R.D. at 195.  At the January 22, 2008 hearing, Class Counsel confirmed that their work involved no duplication of effort.

**B. Litigation Costs and Expenses**

Class Counsel have expended a total of $208,207.96 in out-of-pocket litigation costs and expenses in connection with representing the Settlement Class.[21]  Accordingly, they request reimbursement for these expenses.[22]  "Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund."  In re Aetna, 2001 U.S. Dist. LEXIS 68, at *40 (citing In re Ikon, 194 F.R.D. at 192).  There has been no objection to the request for reimbursement.  After reviewing the documented expenses, the Court concludes that they are fair and reasonable.[23]

**C. Compensation for Named Plaintiffs**

Finally, Class Counsel request special compensation for Named Plaintiffs Frances Maane

---

[21]     These expenses include, inter alia, travel reimbursement, transcript fees, printing and copying fees, website expenses, legal research fees, courier services, and postage.  Expenses of this nature have been approved in this Circuit.  See, e.g., Yong Soon Oh, 225 F.R.D. at 154 (approving documented expenses for "(1) travel and lodging, (2) local meetings and transportation, (3) depositions, (4) photocopies, (5) messengers and express services, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, court and witness fees, (9) overtime and temp work, (10) postage, (11) the cost of hiring a mediator, and (12) NJ Client Protection Fund—pro hac vice"); Cullen, 197 F.R.D. at 151 (approving documented expenses for "copying, expert witnesses, transcripts, depositions fees, on-line research, travel and meals, postage and delivery services, subpoena service and witness fees and telephone").

[22]     Class Counsel attest that they have received no compensation from any source for their work on behalf of the Settlement Class.  Certain counsel have been compensated for their expenses in reaching a settlement on behalf of original Plaintiff James Mehling, but all compensation received related solely to work on his individual case, which involved claims unrelated to those of the class.

[23]     Additionally, as of January 21, 2008, Class Counsel have incurred fees of $125,307.76 in connection with notice and administration of the settlement.  These fees include $5,000 for design and maintenance of the settlement website for three years, $25,446.86 for postage, $13,395 for publication of the summary notice in USA Today, and $81,465.90 for printing expenses, notice program management, and claim form processing.  The Court finds these fees fair and reasonable and approves their reimbursement.

and Lee Bowers, in the amounts of $15,000 and $7,500, respectively.  The Named Plaintiffs have served as class representatives for the duration of this litigation and have been involved throughout in several ways, such as attending settlement conferences, meeting with attorneys, identifying and working with absent class members and other witnesses, and responding to discovery requests.  The Named Plaintiffs have dedicated significant amounts of time on behalf of the class, and they may have incurred risks to future employment, as their "high-profile" role in this litigation could be looked upon unfavorably by future employers.[24]  If this compensation is awarded, the net recovery of every other 401(k) Plan Member would be reduced only by one quarter of one percent.  Additionally, the mailed notice informed class members of the requested awards, and as of January 22, 2008, no one has objected.

Numerous courts have recognized the authority to award compensation to named plaintiffs in class action litigation.  See, e.g., Cullen, 197 F.R.D. at 145 ("[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." (quoting In re S. Ohio Corr. Facility, 175 F.R.D. 270, 272 (S.D. Ohio 1997))).  The size of the awards are consistent with other awards in this District.  See, e.g., In re Auto. Refinishing Paint Antitrust Litig., 2008 U.S. Dist. LEXIS 569, at *23 (E.D. Pa. Jan. 3, 2008) (approving a $30,000 award for each class representative); In re Linerboard, 2004 U.S. Dist. LEXIS 10532, at *57-58 (finding that an award of $25,000 for each class representative is comparable to other awards in this District).  Accordingly, the Court approves the awards to Named Plaintiffs Maane and Bowers.

---

[24]      Ms. Maane remains an active employee of NYL and therefore faced the added anxiety of litigating against a current employer.

**VII.    CONCLUSION**

For the reasons discussed above, the Motion and Petition will be granted.  An appropriate

Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES A. MEHLING, et al.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 99-5417** |
| | : | |
| **NEW YORK LIFE INSURANCE CO., et al.** | : | |

## ORDER AND FINAL JUDGMENT

**AND NOW**, this        4th        day of March, 2008, after a hearing on January 22, 2008,

and after due notice of the proposed settlement and of the hearing was given to all members of

the Settlement Class whose interests are affected by the proposed settlement, and after the terms

of the proposed settlement having been heard and considered by the Court, it is hereby

**ORDERED** as follows:

1.        To the extent defined in the Settlement Agreement, the terms in this Order shall

have the meanings set forth therein.

2.        The Court determines pursuant to Rule 23(e) of the Federal Rules of Civil

Procedure that the form and method of notifying members of the Settlement Class through

mailing of the Settlement Notice and Publication Notice constitute adequate notice, and that due

and sufficient notice of the proposed settlement, the Settlement Hearing and the rights of all

members of the Settlement Class has been provided.  The Court further determines that such

notice meets all requirements of due process; and that all members of the Settlement Class are

bound by the Order and Final Judgment entered herein.

3.        Pursuant to Rule 23(e), the Settlement Agreement and the terms thereof, including

the Plan of Allocation and the terms thereof, are finally approved and confirmed as being fair,

adequate, and reasonable as to the Plans and all members of the Settlement Class.  The Parties

are hereby directed to take the necessary steps to effectuate the terms of the Settlement

Agreement.

4.      This action, and all claims asserted in the Revised Third Amended Complaint

(with the exception of Mehling's Individual Claims) whether asserted by Named Plaintiffs on

their own behalf or on behalf of the Settlement Class, or derivatively to secure relief for the

Plans, are hereby dismissed with prejudice, without additional costs to any of the Parties other

than as provided for in the Settlement Agreement.  As of the Effective Date of Settlement, each

Named Plaintiff and each member of the Settlement Class shall be (i) deemed conclusively to

have, and by operation of this Order shall have, fully, finally, and forever settled, released,

relinquished, waived, and discharged each Defendant and the Related Parties from all Released

Claims (as defined in Paragraphs 1.39 and 5.1 through 5.4 of the Settlement Agreement), and (ii)

barred from suing any Defendant or any of the Related Parties in any action or proceeding

alleging any of the Released Claims, even if any Named Plaintiff or member of the Settlement

Class may thereafter discover facts in addition to or different from those which the Named

Plaintiffs and the members of the Settlement Class now know or believe to be true with respect

to the Action and the Released Claims, whether or not such Named Plaintiffs and members of the

Settlement Class have executed and delivered a Former 401(k) Plan Plaintiffs Claim Form, filed

an objection to the settlement embodied in the Settlement Agreement or to any application by

Class Counsel for an award of Attorneys' Fees and Expenses, or the objections or claims for

distribution of such Named Plaintiffs and members of the Settlement Class have been or later are

approved or allowed.  In addition, as of the Effective Date of Settlement each of the Plans shall be (i) deemed conclusively to have, and by operation of this Order shall have, fully, finally, and forever settled, released, relinquished, waived, and discharged each Defendant and the Related Parties from all Released Claims, and (ii) barred from suing any Defendant or any of the Related Parties in any action or proceeding alleging any of the Released Claims, even if the Plans may thereafter discover facts in addition to or different from those which the Plans now know or believe to be true with respect to the Action and the Released Claims.

5.      The Court having considered the application of Class Counsel for an award of attorneys' fees and reimbursement of expenses out of the Gross Settlement Fund, the Court hereby grants the application and awards to Class Counsel out of the Gross Settlement Fund attorneys' fees in the amount of $4,200,000 and reimbursement of expenses in the amount of $208,207.96.  The Court also hereby approves and awards to each of the two Named Plaintiffs special payments in consideration of their efforts benefitting all Settlement Class members.  The amount of the special payment to Named Plaintiff  Bowers is $7,500, and the special payment to Named Plaintiff  Maane is $15,000. These payments shall be in addition to the sums that each Named Plaintiff is entitled to receive under the terms of the Plan of Allocation.  These awards of fees and expenses and special payments to the Named Plaintiffs shall be paid from the Gross Settlement Fund within ten (10) business days of the Effective Date in the manner provided in the Settlement Agreement.  These awards will include a pro rata share of interest earned on the settlement fund from the date of this Order until the date the awards are paid out.  The Court also hereby approves the payment from the Gross Settlement Fund of Administrative Expenses previously incurred or paid in connection with notice and administration of the settlement in the

amount of $ 125,307.76.  On or before April 30, 2008, the parties shall submit for the Court's approval their proposal for the amount of a reserve for payment of future anticipated Administrative Expenses.

6.      The Court hereby approves of the establishment of the Gross Settlement Fund described in Paragraphs 1.24 and 4.1 of the Settlement Agreement and, in particular, approves of its treatment as a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1(a).

7.      The costs and expenses, including the payment of taxes or tax withholdings, associated with the investment of the Gross Settlement Fund and/or the administration of the Settlement Agreement, including the Plan of Allocation, shall be paid pursuant to the terms of the Settlement Agreement.

8.      In the event that any condition identified in Paragraph 6.6 of the Settlement Agreement becomes applicable, then (a) this Order and Final Judgment shall be rendered null and void and shall be vacated and of no further force or effect, without prejudice to any party, and Plaintiffs and Defendants shall be deemed to have reverted to their respective statuses prior to the execution of the Settlement Agreement, and they shall proceed in all respects as if the Settlement Agreement had not been executed and the related Orders had not been entered, preserving in that event all of their respective claims and defenses in the Action and (b) Class Counsel and Defendants' Counsel shall provide the Escrow Agent, within five (5) business days of the settlement termination date, with a fully executed written notice directing the Escrow Agent to release immediately all monies in the Escrow Fund exclusively to Defendant New York Life Insurance Company (or any other entity identified by the Company for this purpose), excluding (i) any amounts designated in such notice up to a maximum of $100,000 as having

been paid or having been incurred and remaining to be paid as Administrative Expenses pursuant to Paragraphs 2.5(e) and 4.1 of the Settlement Agreement, and (ii) any Taxes and Tax Expenses specified in such notice as having been paid or having been incurred and remaining to be paid on the income on the Escrow Fund prior to release which are to be paid from the Escrow Fund prior to release by the Escrow Agent.

9.      Without further order of the Court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of the Settlement Agreement.

10.      The Parties, including the members of the Settlement Class, submit to, and the Court shall retain, continuing jurisdiction of this matter for the purposes of consummating, implementing, and enforcing the Settlement Agreement and the terms of this Order and Final Judgment, resolving any disputes that may arise in accordance with the procedures set forth in Paragraph 6.5 of the Settlement Agreement, and entering any further Orders as may be necessary and appropriate, in each case without affecting the finality of this Order and Final Judgment.

11.      The Clerk of the Court is directed to enter this Order and Final Judgment as a final judgment and dismissal with prejudice with respect to each Named Plaintiff and each member of the Settlement Class pursuant to Federal Rule of Civil Procedure 41(a)(2).  The Court's reservation of continuing jurisdiction pursuant to the preceding paragraph shall not affect in any way the finality of this Order and Final Judgment.

**BY THE COURT:**

 **/s/ Bruce W. Kauffman**
**BRUCE W. KAUFFMAN,  J.**

-30-